**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-7138

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

THEODORE MACON CARRINGTON, JR.,

Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:21-cr-00005-UA-1)

Argued:  September 20, 2023                    Decided:  January 23, 2024

Before RICHARDSON and HEYTENS, Circuit Judges, and FLOYD, Senior Circuit Judge.

Dismissed by published opinion.  Judge Richardson wrote the opinion, in which Judge Heytens and Senior Judge Floyd joined.

**ARGUED:**  Mark A. Jones, BELL, DAVIS & PITT, PA, Winston-Salem, North Carolina, for Appellant.  Julie Carol Niemeier, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Sandra J. Hairston, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

RICHARDSON, Circuit Judge:

Theodore Carrington appeals the district court's order finding him "subject to the [civil-commitment] provisions of 18 U.S.C. § 4246." J.A. 301. He argues that (1) the order is invalid because he was no longer in the Attorney General's legitimate, time-sensitive custody when the court made this finding, and (2) he received ineffective assistance of trial counsel. But we lack jurisdiction to hear Carrington's claims on the merits. The district court's order is neither a final judgment nor an appealable collateral order. So, for these reasons, we dismiss his appeal.[1]

## I.      Legal Framework

Carrington's appeal deals with the unfortunate reality that some criminal defendants are mentally incompetent to stand trial and are thus committed to specialized government institutions pretrial. And some of those defendants have persistent mental illnesses that make them dangerous enough to warrant their long-term commitment, even if they are not convicted of a crime. But the Constitution rightly prohibits a person from being detained indefinitely just because he falls into the former category. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). So, to commit a criminal defendant beyond the time needed to determine whether his competency to stand trial may be restored, the government must institute civil-commitment proceedings to establish that he falls into the latter category. *Id.*

---

[1] Carrington filed this appeal in conjunction with another appeal from his civil-commitment proceedings. We address this second appeal in an unpublished opinion issued today. *See United States v. Carrington*, No. 23-6348 (4th Cir. Jan. 23, 2024) (unpublished).

Two federal statutes implement these principles: 18 U.S.C. §§ 4241 and 4246. The first establishes procedures for holding a criminal defendant in custody pending a determination of his competency to stand trial. The second addresses the separate civil proceedings the government must institute in order to commit him outside of § 4241's limits. The interplay between these statutes requires some unpacking.

### A.    Section 4241

During a criminal prosecution, either the defendant or the government may request a hearing to determine the defendant's mental competency. § 4241(a). The court must order this hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect" rendering him incompetent to stand trial. § 4241(a). Before the hearing, the court may order a psychiatric or psychological evaluation of the defendant. § 4241(b). And, at the hearing itself, the defendant is entitled to representation by counsel and is allowed to testify, present evidence, subpoena witnesses, and confront and cross-examine any witnesses who appear. §§ 4241(c), 4247(d).

After the hearing, if the court finds by a preponderance of the evidence that the defendant is mentally incompetent to stand trial, it "shall commit the defendant to the custody of the Attorney General." § 4241(d). Section 4241(d) then provides:

> The Attorney General shall hospitalize the defendant for treatment in a suitable facility—
>
> > (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and

3

> (2) for an additional reasonable period of time until—
>
>> (A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or
>>
>> (B) the pending charges against him are disposed of according to law;
>
> whichever is earlier.

*Id.* Finally, the statute stipulates: "If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit the proceedings to go forward, *the defendant is subject to the provisions of sections 4246 and 4248.*"[2] *Id.* (emphasis added).

## B.    Section 4246

Section 4246 picks up where § 4241 leaves off by providing for civil commitment of certain mentally ill persons who are a danger to the community. If the "director of a facility in which a person is hospitalized certifies" that such person is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available," then the director may seek his civil commitment by filing a certificate in the court for the district where the person is confined. § 4246(a). The court that receives the certificate must then

---

[2] Section 4248 provides for the civil commitment of sexually dangerous persons. It is similar to § 4246 in all relevant respects, including its interplay with § 4241. *United States v. Curbow*, 16 F.4th 92, 95 (4th Cir. 2021).

4

hold a hearing to verify the director's finding. *Id.* In the meantime, the filing of the certificate immediately stays the person's release until § 4246 proceedings are completed. *Id.* And once the hearing is completed, if "the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General." § 4246(d).

As the statute makes clear, not every hospitalized person may face civil-commitment proceedings. Rather, § 4246 only applies to someone (1) who is "in the custody of the Bureau of Prisons whose sentence is about to expire," (2) who "has been committed to the custody of the Attorney General pursuant to section 4241(d)," or (3) "against whom all criminal charges have been dismissed solely for reasons related to the mental condition of the person." § 4246(a). So the subject of a civil-commitment certificate may challenge the certificate in the civil-commitment court on the grounds that he didn't fit within one of these three categories at the time the certificate was filed. If he's right, then the certificate must be dismissed for failing to satisfy the necessary elements of a § 4246 civil-commitment claim. *See Curbow*, 16 F.4th at 116. But § 4246(a) doesn't govern subject-matter jurisdiction; a person can waive the argument if he doesn't raise it. *Id*.

5

### C.      Moving from § 4241 to § 4246

Often litigated is the question of whether someone fits into the second category of hospitalized people in § 4246(a).  In other words, what does it mean to say that a person "has been committed to the custody of the Attorney General pursuant to section 4241(d)"?

We've interpreted it to mean that, at the time the § 4246 certificate is filed, a "person *is presently* committed to the Attorney General's custody."  *United States v. Wayda*, 966 F.3d 294, 304 (4th Cir. 2020).  To be presently committed to the Attorney General's custody, a person must have been committed by the criminal court pursuant to § 4241(d). *Id.*  And the commitment order must be legitimately in effect when the certificate is filed, which in turn depends on whether the time limits in § 4241(d) have expired.  *See* § 4241(d) (stating that a (d)(1) custody order lasts for four months and a (d)(2) custody order lasts for "an additional reasonable period of time" until a person's condition improves, if the court deems this likely, or pending charges are dismissed, "whichever is earlier"); *Wayda*, 966 F.3d at 308 (explaining that an additional period of time is reasonable when the government "strive[s] to certify" a person in a way that "eliminates or at least minimizes" his wait for a § 4246 determination).  So if the § 4246 certificate is filed after the period of lawful custody expires, then a person may move for, and the civil-commitment court must order, the dismissal of the certificate as untimely.

When the criminal court issued only one § 4241(d) custody order, the question for the civil-commitment court is straightforward:  Is that order still in effect?  But it gets more complicated when the criminal court issued multiple custody orders.  In that case, may a

6

person challenge the duration of any custody period, or only the most recent one (at least in the civil-commitment court)?

We have opted for the latter approach. *See Curbow*, 16 F.4th at 114–17. When a person challenges a § 4246 certificate's timeliness in the civil-commitment court, the only question before that court is whether he is *presently committed* to the Attorney General's custody under § 4241(d). So if there is a § 4241(d) order on the books, and that order is still in effect, then present custody is conclusively established. Any challenges to delays in prior periods of custody, or to the criminal court's authority to issue the operative custody order, must be raised in the criminal court itself. In effect, this means that the civil-commitment court may only hear challenges to the period of custody that immediately precedes the civil-commitment proceedings.

To illustrate how this works, consider our two recent cases: *United States v. Wayda*, 966 F.3d 394, and *United States v. Curbow*, 16 F.4th 92.

After Wayda was charged with federal sex offenses, the criminal court held a § 4241 competency hearing and found Wayda incompetent to stand trial. *Wayda*, 966 F.3d at 299. Over the next two years, the court entered three commitment orders. The first committed Wayda to the Attorney General's custody to undergo hospitalization "for a reasonable period of time, not to exceed four months," to determine the chances of restoring his competency for trial (pursuant to § 4241(d)(1)). *Id.* After six months passed, the court entered a second order committing Wayda for no more than four months to again determine the chances of restoring him (presumably pursuant to § 4241(d)(2)(A)). *Id.* Then, after many more months passed, the court finally found Wayda incompetent and unrestorable

7

and entered its third order committing him to the Attorney General's custody to determine whether he qualified for civil commitment under §§ 4246 or 4248 (presumably pursuant to § 4241(d)(2)(B)). *Id.* at 299–300.

Six months later, the government filed a § 4248 certificate. *Id.* at 300. Wayda then moved to dismiss the certificate as untimely. *Id.* The civil-commitment court granted Wayda's motion. *Id.* The government appealed, and we affirmed. We agreed with the civil-commitment court that, for a person to be eligible for civil commitment under § 4248(a), the government must file a certificate during its time-limited § 4241(d) custody; otherwise, the certificate is untimely. *Id.* at 304–05. But rather than focusing on the delays following the first or second commitment orders, we examined whether the certificate was filed within a reasonable time after the third and final commitment order. *Id.* at 303. And we determined that Wayda's continued confinement for six months after this last order and before the certificate's filing was unreasonably long. *Id.* at 308; § 4241(d)(2) (limiting custody to "an additional *reasonable* period of time" (emphasis added)). Because of this unreasonable delay, we held that Wayda was no longer legitimately committed to the Attorney General's custody under § 4241(d) when the certificate was filed, and consequently dismissed the certificate as untimely. *Wayda*, 966 F.3d at 309.

In *Curbow*, we explained further why *Wayda* focused on the custody period between the criminal court's last commitment order and the certificate's filing. Like Wayda, Curbow's federal prosecution was also interrupted for competency proceedings. *Curbow*, 16 F.4th at 100. After an initial hearing, the criminal court determined that Curbow was incompetent and committed him to the Attorney General's custody "for a period not to

8

exceed four months" to determine the likelihood of restoring his competency and to assess his dangerousness under § 4246 (pursuant to § 4241(d)(1)). *Id.* at 101. Then, after roughly six months and the filing of the government's competency report, the court issued another order finding that Curbow remained incompetent to stand trial but that there was a substantial probability of restoring him soon. *Id.* So it committed Curbow to the Attorney General's custody for a second reasonable period, not to exceed four months (pursuant to § 4241(d)(2)(A)). *Id.* Four more months passed, and the government eventually determined that Curbow was incompetent and unrestorable. *Id.* But it requested a thirty-day extension for further evaluation, which the court granted by issuing a third custody order (presumably pursuant to § 4241(d)(2)(A)). *Id.*

Thirty days later, the government found that Curbow remained incompetent, that there was not a substantial likelihood of restoring him, and that he satisfied § 4246's dangerousness requirement. *Id.* at 101–02. After passing the report through two more levels of review, the government filed a § 4246 civil-commitment certificate nineteen days later. *Id.* at 102. The filing of the certificate stayed Curbow's release from custody, as provided for in § 4246(a). *Id.*

Thus Curbow had endured three commitment orders, each with its own argument of impermissible delay. So he filed a motion to dismiss in the civil-commitment court, arguing that he was not "committed to the custody of the Attorney General" under

9

§ 4246(a)[3] and that the civil-commitment certificate should be dismissed as a result. *Id.*

Curbow's argument rested both on the alleged delay between the third commitment order

and the filing of the civil-commitment certificate and on the delays that preceded it—*i.e.*,

the delays following the first and second commitment orders. *Id.* at 102, 106. According

to Curbow, the fact that these earlier periods of custody exceeded the applicable § 4241

time limits meant that the Attorney General's legitimate custody over him had expired,

depriving the criminal court of authority to issue the subsequent commitment orders. *See*

*id*. at 106, 113–15.

The civil-commitment court denied Curbow's motion, and we affirmed. *Id.* at 118.

To start, we held that the period of custody immediately preceding the filing of the civil-

commitment certificate—*i.e.*, the period between the third and final commitment order and

the filing of the certificate—was reasonable. *Id.* at 109–10. That meant the most-recent

commitment order was still in effect when the civil-commitment certificate was filed, and

Curbow therefore was "committed to the custody of the Attorney General" for the purposes

of § 4246(a). *Id.*

We then declined to consider whether potential delays in the earlier periods of

custody meant that the Attorney General's custody over Curbow expired before the

---

[3] Curbow and the government agreed that he would not qualify for civil commitment under the other two categories of § 4246(a). *Curbow*, 16 F.4th at 103. So the parties and the court only addressed whether he had been "committed to the custody of the Attorney General." *Id*. As we will discuss, Carrington's appeal similarly only raises the issue of whether he fits within that particular portion of § 4246(a).

criminal court issued its third custody order. *Id.* at 114–17.[4]  Doing so would have required us to hold that, upon review of the *civil-commitment* court's denial of a motion to dismiss, the *criminal* court lacked authority to issue more commitment orders based on past delays. *Id.* at 115, 116 n.11 (declining "to entertain Curbow's theory, as it would require review of orders issued in criminal proceedings . . . by a different district court").  After all, appellate courts typically do not pass on the validity of one court's orders while on appeal from an entirely different court.

But that did not leave Curbow without recourse for delays following the first two commitment orders.  It simply meant he had to challenge the alleged delays in the *criminal* court. *Id.* at 115.  In fact, we gave an example of how Curbow could have done so:  He could have requested the criminal court release him on account of the delays; and if the

---

[4] In this way, our approach is slightly different from the one adopted by the Eighth Circuit in *United States v. Ryan*, 52 F.4th 719 (8th Cir. 2022).  There, the court categorically held that "[a] defendant waives the right in his § 4246 proceeding to challenge the lawfulness of his § 4241(d) custody by not raising it" in the criminal court. *Id.* at 722.  The court in *Ryan* claimed to cite *Curbow* for the proposition that:  "[T]he proper time and place to contest the alleged unreasonable delays in . . . § 4241(d) custody [i]s during the [proceedings in the court that ordered § 4241(d) custody]." *Id.* (alterations and omission in original) (quoting *Curbow*, 16 F.4th at 115).  But this edited quote elides necessary context from *Curbow*'s holding.  The actual quote from *Curbow* reads:  "[T]he proper time and place to contest the alleged unreasonable delays *in the first and second periods* of Curbow's § 4241(d) custody was during the [criminal] proceedings and in the [criminal] court."  16 F.4th at 115 (emphasis added).  This responded to Curbow's contention that delays in the first and second periods precluded the criminal court from ordering a third period of custody.  But both *Wayda* and *Curbow did consider* the reasonableness of delays in the custody period immediately preceding the filing of the §§ 4246 and 4248 certificates.  So while the Eighth Circuit seems to categorically bar civil-commitment courts from considering the reasonableness of the Attorney General's § 4241(d) custody, we permit litigants to challenge the period of custody immediately preceding the filing of the certificate.

court denied that request, then he could have invoked the collateral order doctrine to get our review of the denial. *Id.* Unfortunately for Curbow, though, he never raised these delays after the first two commitment orders in the criminal court. *Id.* at 115–16. So he forfeited these arguments in that court.[5] *Id.* And he couldn't revive them in a challenge to the *civil*-commitment certificate's validity. *Id.*

*          *          *

That was a lot. So before we move on, let's summarize. Section 4241(d) authorizes a criminal court to order a defendant into the government's custody for an evaluation of his competency and restorability. If the government certifies that a person in its § 4241(d) custody is dangerous, then § 4246 allows the government to seek his civil commitment from the court of the district where he is confined.

Yet § 4241(d) establishes time deadlines which circumscribe the competency and restorability evaluation period. If a person is no longer in the Attorney General's legitimate custody by the time the government files the civil-commitment certificate, then he can raise the delay in the *civil* court via a motion to dismiss the certificate. However, as *Curbow* illustrates, delays in periods of custody that preceded the most-recent § 4241(d) order cannot be raised in the civil court. Those must be raised in and addressed by the *criminal* court. And if they aren't, then they're forfeited.

---

[5] Although we used the language of forfeiture, which might imply that we could excuse it in "exceptional circumstances," *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 603 (4th Cir. 2004), we clarified that even then "we would [ ] decline to entertain Curbow's theory, as it would require review of orders issued in criminal proceedings separate from these civil commitment proceedings, by a different district court, and by a district court that is in another circuit." *Curbow*, 16 F.4th at 116 n.11.

12

## II.     Background

Now we can turn to the facts of Carrington's case.  On November 6, 2020, Theodore Carrington sent a threatening email to Senator Ron Johnson's whistleblower email address. Carrington later admitted doing so.  So on January 4, 2021, a federal grand jury for the Middle District of North Carolina indicted Carrington for transmitting a threatening communication in interstate commerce, in violation of 18 U.S.C. § 875(c).

At his detention and arraignment hearing in January 2021, Carrington made several bizarre claims, including that he had been "poisoned" and hit with a "microwave weapon," and that the government was "persecuting [him] and making [him] . . . agitated and trying to defend [him]self for something that isn't real."  J.A. 42–56, 59.  At the close of the hearing, the district court ordered Carrington detained, noting that his release would "pose a risk of danger to the community."  J.A. 72.

Shortly after the hearing, the defense moved for, and the court ordered, a competency evaluation of Carrington under § 4241(a) and (b).  The government completed the evaluation in June 2021 and concluded that Carrington was incompetent to stand trial. So it asked the district court to hold a hearing to determine whether Carrington should be committed to the Attorney General's custody and hospitalized, pursuant to § 4241(d)(1), to attempt to restore his competency for trial.

The court agreed and convened a hearing on August 20, 2021.  At the hearing, the government presented expert testimony that Carrington suffered from delusional disorder and recommended that he be hospitalized under § 4241(d)(1) for treatment and restoration of competency.  The government's expert also explained that there was a five-month

13

waiting period to enter federal medical centers and estimated that the restoration period would take four months. Carrington's counsel responded by expressing concern that the government would not complete its competency evaluation within the required four-month statutory window. Nevertheless, the district court found that Carrington was incompetent to stand trial, so it ordered him committed to the Attorney General's custody for hospitalization and treatment "for a reasonable period of time not to exceed four months." J.A. 150. The district court also noted that if the government could not meet the four-month deadline, it could contact the court and provide more information. The court later entered an order on August 23, 2021, summarizing its conclusions and formally committing Carrington to the Attorney General's custody.

Though the court issued its custody order in August, Carrington was not admitted to the Federal Medical Center in Butner, North Carolina, until January 18, 2022. The government later completed and filed its competency and restorability evaluation on May 20, 2022.[6] It concluded that Carrington was still incompetent to stand trial due to his delusional disorder. And it judged that because he was not a suitable candidate for involuntary medication, there was not a substantial likelihood that his competency could be restored. The report also noted that Carrington met the criteria for § 4246 commitment and that the government would go forward with that process. The government then filed a § 4246 certificate on May 26, 2022, in the Eastern District of North Carolina. And, per the

---

[6] The report and cover letter are dated May 2 and May 5, respectively, but they were not filed with the district court until May 20.

government's request, the Eastern District issued a stay of the civil action, pending completion of the Middle District's criminal competency proceedings.

The Middle District eventually conducted a competency and restorability hearing on August 26, 2022. The government's expert, who had prepared the restorability report, testified to her conclusions about Carrington's condition and the unlikelihood of restoring him. But at the close of evidence, Carrington's counsel asked to "put on the record" Carrington's objections to a delay in his evaluation process. J.A. 268. She noted *Curbow* and stated:

> Essentially the objection for the record is this, Your Honor: The Defendant does not waive and objects to the period between August 23, 2021, which would be the Court's order at D-35 transporting him for evaluation, and the end period of that report of May 15, 2022, for the purpose of review of the [A]ttorney [G]eneral's subject matter jurisdiction over the Defendant and on the issue of unreasonable delay.

J.A. 269. She pointed out that *Curbow* found a defendant had waived his objections to custody delays by not raising them in the criminal court and then again stated that she wanted to present the issues to the Middle District in case Carrington's lawyer in the civil proceedings wanted to make timeliness objections in the Eastern District. J.A. 269–70.

The Middle District, confused by this assertion, asked what Carrington's attorney was arguing and how it related to the criminal case. She rephrased her *Curbow*-related statements several times, but the district court still didn't understand. So it instructed

15

Carrington to file a motion explaining the position and deferred ruling on Carrington's competency.[7]

Carrington's counsel filed a "notice" with the Middle District soon after, clarifying the objections raised at the hearing. She explained the case's procedural posture and the alleged delay in her client's § 4241(d) evaluation process. She then argued that because of this delay, the Eastern District did not have jurisdiction to commit Carrington under § 4246, or, in the alternative, that the Eastern District should dismiss the certificate for failure to state a claim. But at no point did Carrington's counsel request any form of relief from the Middle District or even explain the effect of these delays on the criminal case. Instead, her brief was directed to preserving arguments to be made in the Eastern District at a future date. J.A. 292 ("Mr. Carrington respectfully herein Notices in the criminal trial court his objection to the delays . . . *for the purpose of further motion properly filed in the E.D.N.C. civil proceedings*, maintaining and not waiving objection thereto . . . ." (emphasis added)). The government made no formal response to the filing since it appeared that Carrington was not requesting any relief from the Middle District.

On September 15, 2022, the Middle District entered an order concluding that Carrington was incompetent to stand trial and that there was not a substantial probability of restoring his competency. It therefore found him "subject to the provisions of 18 U.S.C.

---

[7] Later in the hearing, the court seems to have thought it was also determining whether Carrington should be civilly committed. But the government clarified that the court would only be determining the question of competency, restorability, and involuntary medication, and that the civil-commitment proceedings would take place in the Eastern District.

§ 4246." J.A. 301. In a footnote, the court addressed his timeliness objections. It observed that Carrington's argument "does not appear to require any action on the part of this court." J.A. 302 n.1. Yet the court stated that it would "note that Defendant has not waived any time periods in this court, the waiver which might implicate the opinion and holdings expressed in [*Curbow*]." *Id.* But it left the "resolution of these issues to the Court in the Eastern District of North Carolina." *Id.*

One day later, the government moved to dismiss the indictment against Carrington without prejudice. The Middle District granted the motion, and Carrington filed the instant appeal.

The government later asked the Eastern District to lift the stay on the civil-commitment proceedings. After conducting a § 4246 hearing, the Eastern District ordered Carrington into the Attorney General's custody on March 20, 2023. He timely appealed that order, too.

## III.   Discussion

In this appeal from the criminal court (*i.e.*, the Middle District), Carrington argues that the Middle District erred in finding him "subject to the provisions of 18 U.S.C. § 4246" because of an unreasonable delay that allegedly occurred during his § 4241(d) evaluation process. He therefore asks us to vacate this order. And he alleges that he received ineffective assistance of trial counsel. But before considering these claims on the merits, we must ensure we have jurisdiction. *See Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019). Carrington argues that we have jurisdiction under the final judgment rule

17

or, in the alternative, under the collateral order doctrine. But neither avenue opens the door for our review. Accordingly, we must dismiss this appeal for lack of jurisdiction.

### A.      Final Judgment Rule

Section 1291 gives federal courts jurisdiction over "final decisions of the district courts." 28 U.S.C. § 1291. A final judgment is the quintessential "final decision" because it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Caitlin v. United States*, 324 U.S. 229, 233 (1945); *Abney v. United States*, 431 U.S. 651, 658 (1977) (noting how final judgments are always final decisions). In criminal cases, "final judgment means conviction and sentence." *United States v. Under Seal*, 853 F.3d 706, 717 (4th Cir. 2017) (quoting *United States v. Lanham*, 631 F.2d 356, 357 (4th Cir. 1980) (per curiam)); *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989). The dismissal of an indictment without prejudice "is clearly neither," meaning "the appropriate time to review a dismissal [without prejudice] is after reindictment and conviction." *Under Seal*, 853 F.3d at 717 (quoting *Lanham*, 631 F.2d at 357).[8]

These principles preclude our review of Carrington's case as a final judgment. Carrington appeals from the Middle District's dismissal of his indictment without prejudice. That's not a conviction and sentence; so it's not a final judgment.

---

[8] The *government* may, of course, appeal the dismissal of an indictment. Yet this is not because such dismissals are final judgments, but rather because Congress has provided for our jurisdiction over such appeals through a separate statutory provision. *See* 18 U.S.C. § 3731 ("In a criminal case an appeal *by the United States* shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information . . . except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." (emphasis added)).

Carrington seems to acknowledge he is fighting an uphill battle; yet he still contends that the dismissal of a criminal indictment without prejudice is an appealable final judgment because of our recent decisions in *Bing v. Brivo Systems, LLC*, 959 F.3d 605 (4th Cir. 2020), and *Britt v. DeJoy*, 45 F.4th 790 (4th Cir. 2022) (en banc). In *Bing*, we held that the dismissal of a civil complaint without prejudice for failure to state a claim qualifies as a final judgment if "the grounds for dismissal clearly indicate that no amendment in the complaint could cure the defects in the plaintiff's case." 959 F.3d at 610 (quoting *Domino Sugar Corp. v. Sugar Workers Loc. Union 392*, 10 F.3d 1064, 1067 (4th Cir. 1993)). And in *Britt*, our en banc court went a step further and established a bright-line rule that "[w]hen a district court dismisses a complaint or all claims without granting leave to amend, its order is final and appealable." 45 F.4th at 791. Carrington believes these decisions indicate that the dismissal of a criminal indictment without prejudice is an appealable final judgment, at least when the district court fails to specify whether further amendment of the indictment is possible.

But Carrington's argument misses the key distinction between those cases and his own: *Bing* and *Britt* involved dismissals of *civil* complaints in *civil* cases. Neither decision purported to alter the fundamental jurisdictional principles that govern criminal cases. Nor could they have—the criminal final judgment rule comes from binding Supreme Court precedent. *See Midland Asphalt*, 489 U.S. at 798 ("In criminal cases, [§ 1291] prohibits appellate review until after conviction and imposition of sentence."); *see also Sell v. United States*, 539 U.S. 166, 176 (2003). Altering it is above our pay grade. Besides, principles of finality in criminal cases have never been treated as coextensive with principles of

19

finality in civil cases. Criminal administration demands stricter adherence to rules of finality. *See, e.g.*, *Di Bella v. United States*, 369 U.S. 121, 126 (1962); *United States v. MacDonald*, 435 U.S. 850, 853–56 (1978); *Cobbledick v. United States*, 309 U.S. 323, 325 (1940) (noting that the policies behind finality "are especially compelling in the administration of criminal justice"). So there's no indication that *Bing* and *Britt* have any bearing on whether the district court's dismissal of Carrington's criminal indictment is a final judgment. Accordingly, we're left with the conclusion that it is not one.

## B.    Collateral Order Doctrine

That said, the Supreme Court has long recognized a narrow exception to the final judgment rule, known as the collateral order doctrine, which regards certain non-final judgments as "final decisions" sufficient to trigger § 1291. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–46 (1949). This exception allows us to review an otherwise-not-final judgment if the decision "(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Sell*, 539 U.S. at 176 (alterations in original) (internal quotation marks omitted).[9]

Few orders qualify for this exception. And even fewer do so in criminal cases, because the compelling interest in speedy criminal trials requires us to interpret the

---

[9] Carrington also appeals from the Middle District's September 14, 2022, denial of certain *pro se* motions he filed. *See* Opening Br. at 18. But that order isn't a final order for the same reasons the dismissal of the indictment isn't one (*i.e.*, it is not a conviction and sentence). And Carrington acknowledges that, if we proceed under the collateral order doctrine, his appeal of the district court's September 14 order is untimely and therefore unreviewable. *See* Opening Br. at 18 n.1.

collateral order exception "with the utmost strictness." *Midland Asphalt*, 489 U.S. at 799 (quoting *Flanagan v. United States*, 465 U.S 259, 265 (1984)).  Hence, the Supreme Court has applied the exception to only four types of orders in criminal cases:  orders denying motions to reduce bail, *see Stack v. Boyle*, 342 U.S. 1, 4 (1951); orders denying motions to dismiss on Double Jeopardy grounds, *see Abney v. United States*, 431 U.S. 651, 659 (1977); orders denying motions to dismiss under the Speech and Debate Clause, *see Helstocki v. Meanor*, 442 U.S. 500, 507–08 (1979); and orders authorizing forced medication of criminal defendants, *see Sell*, 539 U.S. at 177.

But this Court has identified other such orders.  Most relevant here, we have held that § 4241(d) custody orders are appealable collateral orders.  *See Curbow*, 16 F.4th at 115 (finding that a § 4241(d) commitment order is an appealable collateral order); *see also United States v. Tucker*, 60 F.4th 879, 886 (4th Cir. 2023) (same).  And for good reason. Whether a defendant was rightfully committed pretrial is separate from the merits of his criminal prosecution and is resolved once the district court issues a § 4241(d) order.  *See, e.g.*, *United States v. Gold*, 790 F.2d 235, 238–39 (2d Cir. 1986).  And this issue is sufficiently important because such a custody order threatens his liberty.  *Id.*  Lastly, a § 4241(d) order is effectively unreviewable after final judgment:  Either a defendant will never regain competency, in which case the decision will never be reviewed; or he will regain competency and be acquitted, in which case he will not appeal; or he will regain competency and be convicted, in which case he can raise the issue on appeal, but any relief would be moot.  *Id.* at 239.  So § 4241(d) custody orders are rightly treated as appealable collateral orders.

21

Carrington argues that, because § 4241(d) orders are reviewable under the collateral order doctrine, the Middle District's September 15 order is too. But the problem is that this order is not a custody order.

Recall that the order followed a hearing convened to determine whether Carrington remained incompetent and unrestorable for trial. So the order stated the Middle District's findings that Carrington was incompetent to stand trial and that there was no substantial probability that his competency could be restored such that the trial could proceed. After making these findings, the order summarily stated that Carrington was "subject to the provisions of 18 U.S.C. § 4246." J.A. 301.

But the mention of § 4246 did not transform the September 15 order into a custody order. On its face, the order says nothing about committing Carrington for further custody. This is probably because there was no need for another commitment order—the Middle District had already committed Carrington to the Attorney General's custody pursuant to § 4241(d)(1) in a prior order. And the government had already filed a civil-commitment certificate in the Eastern District months before the Middle District issued the September 15 order. Under § 4246(a), that civil-court filing immediately stayed Carrington's release pending proceedings before the Eastern District. *See* 18 U.S.C. § 4246; *Wayda*, 966 F.3d at 305 ("[A]ny additional period of confinement beyond the initial four month § 4241(d)(1) hospitalization to address competency depends on the finding of an additional justification in either § 4241(d)(2) *or the initiation of a civil commitment proceeding . . . .*" (emphasis added)). The September 15 order therefore had no effect on Carrington's custody. By the time it was issued, he had already entered the Attorney General's custody and would

22

remain there until the Eastern District disposed of the civil-commitment proceedings. So the September 15 order is not an appealable custody order.

To his credit, Carrington never explicitly argues that the September 15 order is a custody order. But he does assert that it is a collateral order because it "conclusively resolved the question of the applicability of 18 U.S.C. § 4246." Opening Br. at 18. Carrington suggests that the Middle District's order made factual and legal conclusions that somehow bound the Eastern District to order his commitment. In support of this conclusion, he points out that the government told the Middle District that it was tasked with "answering the question of competency in the criminal case . . . and then future restorability," and the Middle District acknowledged that, "depending on that answer," "[t]he Eastern District would take care of" his civil commitment. J.A. 283. He also notes that the Eastern District stayed its civil-commitment proceedings until completion of the criminal proceedings, which Carrington thinks happened in anticipation of the Middle District's factual and legal conclusions.

Yet we conclude that the Middle District's order lacked binding legal effect. This is for three reasons: First, the criminal court need not find that § 4246 applies before the civil-commitment court can move forward with its proceedings. Second, the criminal court's conclusions about a defendant's mental state are not binding on the civil-commitment court's assessment of that same defendant's mental state. Third, the Middle District in this case did not conclusively resolve the timeliness of any delay in Carrington's custody.

23

Starting with the first, nothing in either §§ 4241 or 4246 indicates that a finding by the criminal court regarding § 4246's applicability is necessary before civil-commitment proceedings can ensue. Section 4241 describes, in several places, the mandatory findings that the criminal court must make before the competency-evaluation process *in the criminal court* can move forward.[10] But the part of § 4241 that seemingly triggers § 4246 says nothing about a court finding—criminal or civil. It simply says that "if it is determined" that a defendant remains incompetent, then he is subject to § 4246. *See* § 4241(d).

And once we hop over to § 4246, it becomes clear that no such judicial finding is required. Section 4246(a) says that civil-commitment proceedings are commenced once the "director of a facility in which a person is hospitalized" certifies that a person is suffering from a mental disease that renders him dangerous to the surrounding community. *See* § 4246(a). And once the director files a certificate, the civil court moves forward with civil-commitment proceedings. *Id.* Nowhere does the statute mention that this process requires a finding from the criminal court that § 4246 applies. These provisions designate the *facility director* as the bridging force between criminal and civil proceedings, not the criminal court. So there is no reason to believe that the Middle District's supposed determination that Carrington was subject to § 4246 had the effect of green-lighting Carrington's civil-commitment proceedings.

---

[10] The criminal court must find there is reasonable cause to believe a defendant is incompetent before ordering a hearing (§ 4241(a)); find him incompetent by a preponderance of the evidence before ordering him into custody (§ 4241(d)); and, if the government wishes to continue holding him until his mental condition improves, find that this is substantially likely to occur within that period (§ 4241(d)(2)(A)).

24

Nor were the Middle District's factual or legal conclusions about Carrington's competency to stand trial binding on the Eastern District's civil-commitment determinations. They couldn't have been—the Middle District's competency determination was under § 4241, while the Eastern District's was under § 4246. And "an evaluation under § 4246 for dangerousness is materially different from an evaluation under § 4241 for competency to stand trial." *Curbow*, 16 F.4th at 96. The two provisions make this clear. In order to issue a § 4241(d) custody order, the criminal court must hold a hearing and determine by a preponderance of the evidence that a defendant is suffering from a mental disease that renders him mentally incompetent to stand trial. *See* § 4241(d). By contrast, to order a defendant's commitment, the civil-commitment court must hold a new hearing and determine by clear-and-convincing evidence that he is suffering from a mental disease that creates a substantial risk of danger to others or their property. *See* § 4246(d). These statutes thus require separate evidentiary hearings, enshrine different burdens of proof, and demand proof of different elements. So it's safe to say that the Middle District's findings about Carrington's competency had no bearing on the Eastern District's decision to order his civil commitment. *Cf. Dowling v. United States*, 493 U.S. 342, 348–49 (1990) (noting the inapplicability of collateral estoppel where a different burden of proof in the prior proceeding means that "the prior [decision] did not determine an ultimate issue in the [later] case").

Finally, the Middle District's order did not resolve the timeliness of any alleged delay in Carrington's § 4241(d) custody. This is because *Carrington did not ask the court to do so*. Recall that Carrington mentioned the possibility of § 4241(d) timeliness

25

violations twice: at the August 26 hearing and in his post-hearing filing. But neither time did he request any relief from the court. At the hearing, he simply asked to "put on the record" that he "did not waive and object[ed]" to alleged delay in his custody. J.A. 268–69. And in his filing, he clearly stated that he was flagging the issues solely to preserve objections to be raised in the *Eastern District*. *See* J.A. 292 ("Mr. Carrington respectfully herein Notices in the criminal trial court his objection to the delays represented in the competency evaluation period and restoration evaluation period, for the purpose of further motion properly filed in the E.D.N.C. civil proceedings, maintaining and not waiving objection thereto . . . ."). In short, Carrington never asked the Middle District to decide whether the government violated § 4241(d)'s time limits. *Cf. Curbow*, 16 F.4th at 115 (explaining how a defendant can challenge his custody in the criminal court). So the Middle District never answered that question. Instead, it rightfully concluded that Carrington's requests did "not appear to require any action" on its part and noted—presumably for the Eastern District's sake—that he had not waived any of his timeliness objections. J.A. 302.

The Middle District's notation about Carrington's objections is not relevant to whether we have jurisdiction to review this appeal. The Middle District *decided* nothing relating to the timeliness of Carrington's § 4241(d) custody. So there is no way its September 15 order had any binding effect on the Eastern District's proceedings.[11] *See In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (noting that collateral

---

[11] Because the Middle District did not determine whether the evaluation process was reasonable in duration, we do not address what would have happened had it done so.

26

estoppel only applies to those "issues which have been actually determined and necessarily decided in prior litigation" (internal quotation marks omitted)).

This all leads to the conclusion that the evidence Carrington points to—namely, that the Middle District and Eastern District mentioned each other in their respective proceedings—doesn't show that the order at issue affected the Eastern District's legal determination.  That evidence merely shows the two courts recognized that their proceedings were related.  When the Middle District acknowledged that, "depending on" whether Carrington was incompetent and unrestorable, "[t]he Eastern District would take care of" his civil commitment, J.A. 283, it was not saying that the Eastern District was legally dependent on the Middle District's factual or legal findings.  Rather, it was recognizing that civil commitment might not be necessary depending on how Carrington's criminal case was resolved.  If the Middle District determined that Carrington was competent to stand trial, or that he was likely to be restored, then there would be no need for civil commitment since his trial might eventually proceed.  But if the court found him incompetent and unrestorable—as it did—then the government would need to go forward with civil commitment.  So the Eastern District was only dependent on the Middle District in the sense that the latter's findings might render the former's proceedings unnecessary.

And the fact that the Eastern District issued a stay supports this conclusion, Carrington's contentions notwithstanding.  Indeed, the government requested that stay because it recognized that "a finding of competency by the [Middle District] would allow the criminal proceedings to move forward and negate the need for the [ ] commitment proceedings." *United States v. Carrington*, No. 5:22-hc-01093-BO (E.D.N.C. June 29,

27

2022), ECF No. 5. Put differently, the government wanted a stay in the civil proceedings because the Middle District's competency and restorability determination might obviate the need for civil commitment—*not* because the Eastern District needed to wait for the Middle District's factual or legal conclusions before forging ahead.

What, then, was the effect of the Middle District's statement that Carrington was "subject to the provisions of 18 U.S.C. § 4246"? From the law's perspective, the answer is nothing. The court may have thought that it needed to say this, or maybe even that it would have some effect on the civil-commitment proceedings. But more likely, the court was just stating the consequences of its unrestorability finding without expecting its statement to do anything. Regardless, identifying the district court's reason for making the statement is unnecessary. What matters is that, in the eyes of the law, the September 15 order had no legal effect on Carrington's continued custody or his eventual civil commitment. And because it did not harm Carrington's legal interests, it is not an appealable collateral order. Thus we lack jurisdiction to review it under the collateral order doctrine.[12]

\*          \*          \*

On appeal from the dismissal of Carrington's criminal indictment, he asks us to review the timeliness of his § 4241(d) custody and determine whether he received ineffective assistance of trial counsel. Yet the district court's dismissal is neither a final

---

[12] Carrington argues in the alternative that the order qualifies for correction by writ of mandamus. Opening Br. at 28 n.3. But his case does not meet the strict requirements for this drastic remedy. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018).

28

order nor an otherwise-reviewable collateral order.  So we lack jurisdiction to review the merits of Carrington's claims.  The appeal is therefore

*DISMISSED.*